2025 IL App (4th) 250219

NO. 4-25-0219

FILED
September 12, 2025
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| PATRICIA HERREN and MARY ANN HERREN, | ) | Appeal from the |
| Plaintiffs-Appellees, | ) | Circuit Court of |
| v. | ) | Calhoun County |
| BRENT J. BESHEARS, as Trustee of the Brent J. | ) | No. 23MR5 |
| Beshears Revocable Living Trust, Dated | ) | |
| November 11, 2016, | ) | Honorable |
| Defendant-Appellant. | ) | Zachary P. Boren, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HARRIS delivered the judgment of the court, with opinion.
Justices Doherty and Grischow concurred in the judgment and opinion.

**OPINION**

¶ 1        Plaintiffs—Patricia Herren and Mary Ann Herren—brought an action against defendant—Brent J. Beshears, as trustee of the Brent J. Beshears revocable living trust, dated November 11, 2016—seeking declaratory and injunctive relief based on a claim that they had acquired a prescriptive easement over a private road on defendant's property that allowed them to access their own property. The trial court entered a preliminary injunction in plaintiffs' favor, ordering that plaintiffs, along with their guests, tenants, and invitees, had the right to use the private road to access plaintiffs' property and that defendant could not prevent or interfere with such use. Defendant filed this interlocutory appeal, arguing the court abused its discretion in (1) granting plaintiffs a preliminary injunction and (2) refusing to limit the scope of the preliminary injunction. We affirm.

¶ 2                              I. BACKGROUND

¶ 3          Plaintiffs and defendant own adjoining property located in Calhoun County, Illinois. Defendant owns 70 acres (the Beshears property), which he purchased in January 2023. At that time, plaintiffs owned more than 440 acres (the Herren property) located immediately to the north of the Beshears property. The Beshears property bordered a public township road called Panther Creek Road. The private road that is in dispute runs in a northerly direction from Panther Creek Road across the Beshears property and to the Herren property.

¶ 4          In August 2023, plaintiffs initiated the underlying action, filing a complaint against defendant for declaratory and injunctive relief related to their use of the private road. In October 2023, they filed an emergency motion for a temporary restraining order (TRO), seeking to prevent defendant "from interfering with [plaintiffs], their guests, tenants[,] and invitees (including hunters) use of the private road." In November 2023, the trial court granted the emergency motion and ordered as follows:

> "[Defendant] shall take no action or cause any activities that would prevent [plaintiffs], their guests, tenants, invitees (including hunters) from access to [plaintiffs'] real estate through use of the road situated on [defendant's] real estate nor shall [defendant] interfere with [plaintiffs], their guests, tenants, and invitees (including hunters) use of said road. [Plaintiffs], their guests, tenants, invitees (including hunters[)] shall have the right to use said road for access to [plaintiffs'] real estate until further order of this Court."

¶ 5          In January 2024, plaintiffs filed a two-count first amended complaint, again seeking declaratory and injunctive relief. Plaintiffs alleged the Herren property was " 'landlocked,' " as it did not border a township road and that, for more than 60 years, Patricia and her guests, tenants,

and invitees had exclusively used the private road for ingress to and egress from the Herren property. According to plaintiffs, their use of the private road was done without the permission of the individuals who had owned the Beshears property and defendant's predecessor in title, Lorraine McKay (also referred to in the record as Lorraine Derose or Lorraine DeRuntz), had actual knowledge of plaintiffs' use of the private road for more than 20 years. They maintained that their use of the private road was uninterrupted and did not depend upon a like right in others. Plaintiffs also alleged that defendant wrongfully and intentionally sought to deny them access to their property by locking a gate that blocked entry onto the private road.

¶ 6            In count I of their amended complaint, plaintiffs asked the trial court to declare and order that they and their successors and assigns had a "perpetual easement" for ingress to and egress from the Herren property "over, through[,] and across the private road situated on" the Beshears property and that the easement applied "to [plaintiffs], their successors and assigns and their guests, tenants[,] and invitees (including hunters)." In count II, plaintiffs sought injunctive relief, including a preliminary injunction "directing [defendant] to cease activities that would prevent [plaintiffs], their guests, tenants, and invitees (including hunters) from access to" the Herren property.

¶ 7            In July and August 2024, the trial court conducted hearings on plaintiffs' request for a preliminary injunction. The parties presented the testimony of several witnesses and exhibits. Their exhibits included deeds that showed the various transfers of title for both the Herren and Beshears properties.

¶ 8            Patricia testified she was 86 years old and widowed. Mary Ann was her daughter. In June 1958, Patricia purchased 10 acres of the Herren property from Orlando and May Vetter, whom she had known since she was a child. A house, referred to as the "basement house," and a

barn were located on the property. Around the same time, Patricia's parents, Alfred and Eileen Zipprich, purchased 80 acres of the Herren property, which was located immediately to the north of Patricia's 10 acres.

¶ 9        Patricia asserted that no portion of the 10 acres ever bordered a public road. The Vetters had accessed the property by using the private road that ran from Panther Creek Road through the Beshears property. Since 1958, Patricia had also used the private road as her means of ingress to and egress from the 10 acres. She denied entering or exiting the property any other way. Additionally, Patricia testified that the private road extended through and to the north of the 80 acres that her parents had purchased.

¶ 10        After acquiring the 10 acres, Patricia and her family used the property for her father's cattle, which he also kept on his 80 acres of property. Additionally, the 10 acres had a small "field of corn" and a "big garden." Patricia testified her family stayed at the house on the 10 acres on weekends and that her parents stayed there "[p]ractically every week when [her] dad had days off." They used the property for recreation and had family reunions there a couple of times a year until 1962, when Patricia's father died. Patricia testified she allowed a family friend to use the property for hunting and, from 1967 to 1969, Patricia's brother and sister-in-law resided on the property full-time.

¶ 11        In 1961, Patricia obtained title to her parents' 80 acres, which she stated also did not border a public road. Both she and her parents used the private road that ran through the Beshears property to access the 80 acres. The 80 acres had no "improvements" on it and was used by Patricia's parents for crops and cattle. They would get farm implements to the 80 acres to plant and harvest crops by way of the private road. After Patricia obtained title to the 80 acres, she used it to raise cattle.

¶ 12        The remainder of the Herren property was located north of the 80 acres. In 1993, Patricia's husband, Ronald Herren, who also went by Gene, purchased that additional 352 acres from Billy and Betty Koehler. The Koehlers had resided in a house on the 352 acres and used the property for crops and cattle. Patricia and her husband used it for the same purposes. Patricia denied that the additional acreage ever bordered a public road and asserted that the Koehlers had accessed the property by using the private road. According to Patricia, the private road "from Panther Creek [Road] up" was the only road available for accessing the 352 acres and that it was the only road she ever used when going to that property. In October 2009, title to all the Herren property was transferred to Patricia and Mary Ann as joint tenants, with the right of survivorship.

¶ 13        Patricia testified that when she originally purchased the 10 acres of the Herren property in 1958, the Beshears property was owned by Otto Retzer. Patricia knew who Retzer was and that he did not live on the Beshears property, which she described as "grown up in trees" and consisting of "a creek and two hillsides," with no crops or livestock. Patricia denied ever speaking with Retzer about her use of the private road or ever obtaining his permission to use the private road. She did not know if Retzer ever saw her using the private road to access the Herren property.

¶ 14        In April 1963, Retzer transferred title of the Beshears property to Orville and Edna McKay. Patricia testified that the McKays periodically stayed in a house on the Beshears property but did not live there. Her family had a "friendly" relationship with the McKays but did not socialize with them. Patricia denied ever seeking permission from the McKays to use the private road or discussing her use of the private road with them. However, "many times," the McKays saw Patricia using the private road to access the Herren property.

¶ 15        Around 1973, Patricia and her husband leased the Beshears property from the McKays. Patricia stated they pastured cattle on the property and that their lease ended in

approximately 1987. She testified the lease was oral, her husband had been the one to negotiate the lease with Orville, and she did not know what the two men had discussed. While leasing the Beshears property, Patricia's husband purchased and installed a gate at the entrance of the private road "to keep the cattle in." The gate had a chain with separate locks for the McKays, the Herrens, the Koehlers, and the electrical provider for the properties. The locks remained on the gate until defendant purchased the Beshears property.

¶ 16        In February 1993, the McKays transferred title of the Beshears property to their granddaughter, Lorraine McKay, and her husband. Patricia denied ever discussing the use of the private road with either Lorraine or her husband. Additionally, she stated she never received permission from Lorraine or her husband to use the private road. Patricia estimated that Lorraine had observed her using the private road on the Beshears property four or five times a year "[u]ntil the later years," when Lorraine "didn't come up as much." Patricia testified she got along very well with Lorraine and was friendly with her. She talked to Lorraine when she saw her. However, Patricia denied that the two ever discussed the private road or that she ever asked Lorraine for an easement across the Beshears property. Additionally, Patricia recalled an occasion when Lorraine asked to use her key to the gate at the entrance of the private road because Lorraine had forgotten her own key.

¶ 17        In describing the uses of the Herren property, Patricia testified that, currently, a barn was located on her original 10 acres of the Herren property. The barn was used for storage and contained farm equipment, a boat, and "a lot of junk." The land was also used for hunting. The 80 acres of the Herren property originally purchased by Patricia's parents was similarly used for hunting. A barn on the 352 acres of the Herren property originally purchased by Patricia's husband was also used for storing farm equipment. In the past, portions of the Herren property had crops

and were used for raising cattle. Patricia estimated that her family raised cattle on the Herren property from the early 1960s through approximately 2007. When Patricia first purchased a portion of the Herren property, she used the private road every weekend. In addition to driving cars on the private road, farm machinery and equipment were driven to the Herren property on the private road each year in the spring and fall. When Patricia and her husband had cattle on the property, they used the private road three or four days a week to check on the cattle. They also transported cattle on the private road using trailers.

¶ 18    Patricia testified that a portion of the Herren property was currently enrolled in the Conservation Reserve Program (CRP). She estimated that her property had been enrolled in CRP for more than 10 years and "maybe" as much as 20 years. The CRP ground was managed by Norman Becker. To be enrolled in CRP, a landowner was required to maintain roads on the property, spray crops and weeds, mow, and sometimes reseed. Patricia stated she received compensation for being enrolled in CRP and that she would lose her compensation if the property was not maintained as required.

¶ 19    Patricia also hunted mushrooms on the Herren property with family and friends. Mushroom hunting typically occurred in the month of April. Patricia stated she regularly hunted mushrooms on the Herren property until she was about 82 or 83 years old. Her children also hunted mushrooms each year on the Herren property.

¶ 20    Patricia testified that in the past, her husband had hunted squirrels on the Herren property. She had also allowed her sons and various friends and acquaintances to hunt on the property. Individuals named Ed Dudley and Doug Klucker had paid to hunt on the Herren property, leasing portions of the property from 2001 until 2020. Patricia testified as follows: "[Dudley and Klucker] came from Pennsylvania, originally. There were 13 of them, but Klucker and Dudley are

the only two names I remember because they kept coming back until [2020]." She described the lease as being "only for shotgun season" and agreed that Klucker and Dudley only visited the Herren property and used the private road during the month of November. One of the Pennsylvania hunters was deceased and had been buried on the Herren property.

¶ 21 Patricia testified that a portion of the Herren property was also leased for hunting to Illinois Trophy Bowhunters (ITB). In June 2003, she signed her first lease agreement with that organization. That initial lease was for bow hunting for one year on the "back part of the 350 acres" of the Herren property. Patricia identified a second lease she had with ITB for 2021 through 2023. Her most current agreement with ITB covered deer hunting on the Herren property from 2024 through 2026. Patricia asserted that ITB leased the northernmost 352 acres of the Herren property. She reserved the remaining 90 acres of Herren property for hunting by her sons and friends.

¶ 22 Patricia denied that she was ever given permission by anyone to use the private road on the Beshears property. After defendant obtained the Beshears property in 2023, he met with her and discussed moving the private road. Later, in March 2023, defendant sent Patricia a letter stating he was "changing the locks" on the gate at the entrance to the private road and that she had no right to access to the road without his permission. After discovering that a new lock was placed at the gate, Patricia contacted a lawyer. Patricia testified there were times her sons cut the chain on the gate so that they could gain access to the Herren property. Ultimately, she decided to take legal action against defendant because "he was denying [her family] access to [their] farm."

¶ 23 Defendant testified he was a licensed real estate broker in Michigan and worked as an independent contractor with a commercial brokerage house. He asserted that he had been doing "corporate work in real estate matters" for 30 years. In January 2023, he purchased the Beshears property from Lorraine. He described the property as having mostly timber, with some open

ground that was planted with soybeans. Defendant testified he never spoke directly with Lorraine prior to purchasing the property. Rather, the Beshears property was listed with the realty firm Tarrant and Harmon, and defendant communicated with two individuals associated with that firm—Travis Tarrant and Ryan Bland. Defendant stated that before he purchased the property, Tarrant informed him during a phone call that the McKays and the Herren family had "a handshake agreement" that allowed the Herrens to use the private road. Defendant asserted Tarrant told him about the handshake agreement "[m]ultiple times," but he did not know whether Tarrant mentioned the topic in a text message or e-mail. Defendant also admitted that the only written communications he could provide regarding the topic were text messages from Tarrant and Bland regarding the Beshears property that stated (1) "the seller is adamant there is an existing easement" and (2) "[b]oth the seller [and] the neighbor say there is an easement, but neither can produce a written document [and] nothing has been found."

¶ 24    After closing on the Beshears property, defendant communicated with Patricia. Patricia told him that the Herren property was used for commercial hunting, some of the property was in CRP, and the Herren family used the private road to access their property. Defendant believed that Patricia told him "in an indirect way" that she had permission to use the private road because she informed him of who had access to the private road and how much they used it. He agreed that Patricia did not tell him about a "handshake agreement."

¶ 25    In March 2023, defendant sent a letter to Patricia, stating he intended to install his own locks on the gate and that the Herrens had to have his permission before using the private road. He later installed the new locks on the gate; however, he agreed the new locks did not stop the Herrens from using the private road. According to defendant, the Herrens cut the chain on the gate to access the road "[m]ultiple times." Defendant asserted the Herrens "would just use the land

like they owned it, cut the locks, and keep on with their daily business with no regard of [his] concerns or interests."

¶ 26 On cross-examination, defendant was allowed to present evidence of verbal and text communications he had with Lorraine after closing on the Beshears property. According to defendant, Lorraine informed him that Patricia's family had been using the private road for years, that they had permission to use the private road, Orville had originally granted permission to Patricia's husband, and that although Patricia had asked Lorraine "to put [her] permission in writing," Lorraine refused. Defendant also presented evidence that he drafted a document that put Lorraine's statements in writing. Defendant sent the document to Lorraine through her attorney, asking that she sign it. He later received a signed copy of the letter from Lorraine. Plaintiffs objected to defendant's testimony and evidence on hearsay grounds, noting that Lorraine was deceased and could not be cross-examined. Ultimately, the trial court allowed the evidence for the purpose of showing the effect of Lorraine's statements on defendant and what he knew or believed leading up to the litigation but not to establish the truth of the matters asserted therein.

¶ 27 During his case-in-chief, defendant testified on his own behalf that he purchased the Beshears property to hunt deer and turkey and to plant crops. He asserted that the use of the private road by the Herren family negatively impacted his ability to hunt because they were "driving in and out of the roads running the deer out of the ag fields that [he] was hunting." He stated that video footage from cameras placed on his property showed there were days when six or seven vehicles used the private road. Defendant estimated that he had hunted on the Beshears property 15 to 20 times and that on three of those occasions, deer were "run off by people using the private road." He believed that use of the private road "by people coming in from the south" had "the effect of pushing deer" from his property in a northerly direction, to the Herren property.

Defendant explained that on two occasions, he observed someone "drive in from the south," causing deer to run to the north and onto the Herren property. On a third occasion, he observed someone coming "from the north," which "pushed" the deer south.

¶ 28     Additionally, defendant testified that after closing on the Beshears property, he cleared eight acres of land for planting crops. He intended to continue to plant crops on his property and wanted to expand his cropland onto the area covered by the private road, giving him an additional two acres for planting crops. He also testified that the Herrens "did some roadwork" on the private road and left piles of gravel in his bean field while performing their work.

¶ 29     Norman Becker testified he had known the Herren family all his life and was familiar with the Herren property. In 2000 or 2002, he began hunting on the Herren property after receiving permission from Patricia's husband. He hunted on the property every year since that time and about 15 times each year. Becker hunted for squirrels from August to September, turkeys in April and May, and coyotes from the end of November through February. From approximately 2008 to 2010, Becker helped take care of cattle on the property, including moving cattle to and from the property. In 2013, he began taking care of the Herren property's CRP ground. Maintaining the CRP ground required mowing, spraying for noxious weeds, brush cutting, and reseeding. He estimated that he spent 12 to 15 days per year maintaining the CRP ground. Becker also testified that beginning in 2013, he planted "food plots" for deer on the Herren property to assist with deer hunting. He visited the property two or three times a year to take care of the "food plots."

¶ 30     Becker stated he was familiar with the boundaries of the Herren property. He indicated the property did not border a public road and that he accessed it by using the private road off Panther Creek Road. Becker was not aware of any other roads leading to or from the Herren property. Additionally, he stated he sometimes used a tractor when maintaining the CRP ground,

which he had driven on the private road. He also hauled equipment to the Herren property using his truck and a trailer. Becker estimated that he drove the tractor on the private road 10 to 15 times a year.

¶ 31        Shirley Cloninger testified she was 84 years old, having been born in 1939, and that she and Patricia were "distant cousins." Her parents, the Vetters, previously owned portions of the Herren property, selling it when she was 18 years old. Cloninger testified she resided on the property as a child and used only the private road on the Beshears property to get to and from her family's residence. When she was growing up, the Beshears property was owned by "Mr. Retzer." Cloninger knew Retzer and had conversations with him, but the two never discussed the private road.

¶ 32        On cross-examination by defendant's counsel, Cloninger recalled that Retzer's wife's name was Katie and agreed that "[e]verybody was friends." Cloninger further testified as follows:

"Q. Did your parents socialize with the Retzers?

A. Well, not that much. Nobody ever visited a whole lot, but, I mean, you knew them when you seen [*sic*] them and you talked. That's it.

Q. But, they did, from time to time, socialize?

* * *

A. Yes.

Q. Ms. Cloninger, isn't it true that you assume that the Retzers gave your family permission to use that road, isn't that right?

A. Nobody, just automatically we did it, and nobody ever said anything about it.

- 12 -

Q. But, your assumption is that the Retzers gave your family permission, is that right?

A. I guess. I don't know.

Q. You said you guessed that they gave your family permission?

A. They had to give them, I guess. We went up and down there. We was [*sic*] all neighbors and friends.

Q. And your testimony is that they had to have given you permission, is that right?

A. I guess. I don't know. My folks, too many years."

On redirect examination by plaintiffs' counsel, Cloninger stated she did not know what agreements or arrangements there were for the use of the private road, stating, "We just went up and down it." On recross-examination, defendant's counsel asked whether Cloninger's testimony was that "it was [her] assumption that the Retzers gave [her] family permission to use the private road," and Cloninger responded as follows:

"We just went up and down it. I never heard of anything. I don't know. I was young, and I was 18 when I moved out. But, I don't ever know nothing [*sic*]. I just know we went up and down and nobody said anything to anybody. They were friends."

On questioning by the trial court regarding whether she "assumed there had been permission given," Cloninger responded, "I really don't know."

¶ 33　　　　　　Later, defendant called Cloninger as a witness during his case-in-chief. She testified that at the time she lived on the Herren property, the Retzers owned the Beshears property. She stated her family and the Retzer family were all "friendly," noting that they were "all neighbors."

The Retzers knew Cloninger's parents and went to the same church. Cloninger recalled a period of about two weeks when she worked for the Retzers, staying with them and doing their cooking and laundry after Katie had a medical procedure. Upon questioning by defendant's counsel, Cloninger testified as follows:

"Q. *** So, *** back when you were living at the home place and using the private road ***, isn't it true you assumed that the Retzer's [*sic*] gave your parents and your brother permission to use that road?

A. Yeah, I suppose. I didn't hear them, but, I mean—"

On cross-examination by plaintiffs' counsel, Cloninger then testified as follows:

"Q. So, just as a wrap up from me, you don't know if any permission was given to your parents or not?

A. Not that I ever known of. Of course, I was only six-weeks old when we moved up there, so I don't know."

¶ 34      Cindy Zipprich testified that Patricia was her sister-in-law. She was familiar with the Herren property and lived there with her husband from 1967 to 1969. During that time, she and her husband regularly used the private road on the Beshears property to access the Herren property. Cindy estimated that she used the private road once or twice a week and that her husband, who worked outside the home, used it every day. She also observed members of the Vetter family, who resided further north, "[u]p the hollow," using the private road on a regular basis. Cindy denied having any conversations or hearing any conversations about the private road with the individuals who owned the Beshears property at the time she lived there.

¶ 35      Mary Ann testified that she and her mother owned the Herren property together. She recalled going to the property as a child with her family to check on the cattle or go mushroom

hunting. In the last five years, she visited the property approximately once a year. Mary Ann stated no public roads bordered the Herren property and that she only ever accessed the property by using the private road on the Beshears property. She denied knowing of any permission given to the Herrens related to the use of the private road.

¶ 36 Dennis Herren testified Patricia and Mary Ann were his mother and sister, respectively. He was born in 1965 and had visited the Herren property hundreds of times over the years. The property had been used for raising cattle, growing crops, and hunting. Beginning in 1993 and until the Herren property was enrolled in CRP, Dennis planted corn or hay on portions of the property. Until 2012, cattle were raised on the property. Dennis stated his family's cattle were brought to the Herren property in April each year and then moved to other property the family owned in October. Dennis tended to the cattle on the Herren property at least three times a week from April to October. Since he was 14 years old, he would mow the Herren property at least twice a year.

¶ 37 Dennis also hunted deer and squirrels on the Herren property. He estimated that he had hunted on the Herren property every year since age 14. He visited the Herren property to hunt for squirrels 9 or 10 times in August each year. Dennis testified he hunted deer during both shotgun and bow hunting season. For the last six years, he would haul a trailer to the Herren property so that he could stay there while hunting. Dennis identified three other individuals who would hunt on the Herren property with him. Additionally, he stated he had also hunted for mushrooms on the property five or six times a year since he was about 10 years old.

¶ 38 Dennis maintained that the Herren property did not border a public road and that the only means of accessing the property was by way of the private road on the Beshears property. During times that he planted crops on the Herren property, he traveled over the private road with

farming implements and equipment. Dennis asserted that each year for as long as he could remember, he had cut brush along the private road on the Beshears property "[t]o keep the road from growing in." Over the years, previous owners of the Beshears property had observed him using the private road. Dennis denied that Lorraine had ever discussed the issue of permission to use the private road with him. Further, he was unaware of any oral agreements regarding the use of the private road. Other than one time when there was a flood and he had to access the Herren property by boat, Dennis otherwise always used the private road to get to the Herren property.

¶ 39    Steve Phelps testified he was the founder and president of ITB, an outfitter for deer hunting. Phelps stated ITB leased property and managed the land for hunting. It also had guides that worked with hunters. ITB first leased 170 acres of the Herren property in 2003. At that time, other hunters not associated with ITB hunted on other portions of the property. ITB did not lease the Herren property again until 2021, when it signed a three-year lease for the northernmost 352 acres of the property. In 2024, it signed another three-year lease for hunting on the same 352 acres.

¶ 40    Phelps testified ITB used the private road when accessing the Herren property. ITB hauled all-terrain vehicles on the private road to navigate the Herren property. It also used a tractor on the private road to haul equipment. Phelps denied ever discussing the issue of permission to use the private road with the Herrens.

¶ 41    Phelps testified that each year, ITB hunters went to the Herren property for a total of 25 days of hunting during both "archery season" and "gun season." ITB also visited the property to prepare for the hunters. Preparation involved planting and mowing the food plots, hanging tree stands, trimming brush, cutting trails, and "hunting sheds." The various preparation activities occurred at different times during the year. Specifically, "shed hunts" with ITB hunters and guides would typically occur in March for three to four days. Phelps also hunted shed antlers on his own

three to four times a year. In May and June, ITB would plant food plots and mow. Mowing occurred approximately once a month, and the food plots were "assessed" from May to September. In August or September, ITB would hang tree stands, which consisted of three or four days of work. Typically, ITB would hang approximately 20 tree stands on the Herren property each year. Someone from ITB would also travel to the Herren property to check trail cameras. Additionally, in March and August, ITB spent four or five days on the property cutting trails.

¶ 42    Phelps agreed that ITB hunters used the private road at least twice a day while hunting but that they could use it four times daily or more often if they had "to leave for some reason." Typically, ITB had four hunters on the Herren property for bow hunting and three or four hunters on the property for gun season. The hunters were also accompanied by one or two ITB guides. In 2023, 13 ITB hunters were on the Herren property. Phelps stated that the ITB hunters and guides used their personal vehicles on the private road to access Herren property. He also agreed that he visited the property 8 to 10 times per year.

¶ 43    Calhoun County Sheriff William Heffington testified he was familiar with the Herren family and the Herren property. Beginning in the late 1970s or early 1980s, he had hunted for coyotes on the property. The frequency of his hunting on the property varied. Some years, he visited the property three or four times to hunt, and other years, he would not hunt at all. Heffington agreed that he hunted on the Herren property more frequently in the 1980s than he did currently and stated that he last hunted on the property two years prior. Aside from one instance when he accessed the Herren property by walking "up through the timber," he otherwise accessed it by use of the private road on the Beshears property.

¶ 44    Travis Tarrant was called by plaintiffs as a witness and testified that he was the managing broker for Tarrant and Harmon realty firm. He stated he was involved in Lorraine's sale

of the Beshears property to defendant, noting Lorraine had enlisted his firm to market the property. When Tarrant met Lorraine, she informed him that the Herrens used the private road. Tarrant recalled defendant reaching out to him about the Beshears property. He did not recall whether their first communication was by phone or by text. After their initial communication, the two communicated by text message or e-mail. Tarrant did not remember having any other phone calls with defendant and denied that he ever showed defendant the Beshears property.

¶ 45 On cross-examination by defendant's counsel, Tarrant agreed that Lorraine told him that her neighbors to the north, the Herrens, "were using the private road with her permission." Plaintiffs raised no objection to Tarrant's testimony. On redirect examination by plaintiffs' counsel, Tarrant agreed that during his deposition in the case, he testified he did not remember the exact words used by Lorraine during their conversation and that he did not remember whether Lorraine stated the Herrens had "permission" or were "allowed" to use the private road. On re-cross-examination, he agreed that Lorraine used language that conveyed to him that the Herrens "had permission, authorization, they were allowed to use the road."

¶ 46 Harold Herren, Patricia's son and Mary Ann's brother, testified he was born in 1962. He had been on the Herren property thousands of times to help take care of his family's cattle and to engage in hunting activities. He stated cattle were raised on the property from the time he was a child until approximately 2010. He helped tend to the cattle three times a week. According to Harold, cattle were taken to the Herren property in May or June each year and then removed from the property in October. Stock trucks and horse trailers were used to transport the cattle. Harold recalled mowing the Herren property. He mowed some portions every two weeks using a small lawn mower and other portions on an annual basis using a tractor with a 15-foot mower. Harold also recalled that his brother, Dennis, had raised crops on the property for their

- 18 -

parents, specifically, corn and hay. He observed Dennis using farming equipment on the property, including tractors, combines, and grain wagons.

¶ 47 Harold estimated that he began hunting deer on the Herren property in 1980. He only hunted deer during shotgun season and, at the most, three to four times a year. Later, he also hunted on the property for squirrels and turkeys. He would hunt squirrels in August and September and hunt turkeys in April. Harold stated he had hunted on the Herren property every year except for about five years and that he last hunted on the property in 2022. At times, he hunted on the Herren property with his brothers and various friends and relatives. He had also observed others hunting on the property, including the hunters from Pennsylvania. Additionally, Harold stated he hunted mushrooms on the Herren property two or three times a year.

¶ 48 Harold stated he used the private road on the Beshears property to access the Herren property. The Herren property did not border a public road, and Harold had never entered or exited the property by any path or road other than the private road. Harold further testified that he had driven trucks, tractors, a hay baler, and a hay rake on the private road. He stated previous owners of the Beshears property observed him using the private road. He denied ever having communications with any prior owners regarding the use of the private road.

¶ 49 The parties presented written closing arguments to the trial court. In February 2025, the court entered a written order, granting plaintiffs a preliminary injunction under the same terms and conditions as its previously entered TRO. Notably, in setting forth its decision, the court found that plaintiffs had established a fair question about the existence of a prescriptive easement. It stated plaintiffs had presented evidence that they used the private road for ingress to and egress from the Herren property, as well as evidence showing that their use of the private road since 1958 had been adverse or hostile, exclusive, open and notorious, and uninterrupted. The court rejected

defendant's argument that there was a presumption of permissive use of the private road due to evidence of a "neighborly relationship" between the property owners, finding (1) "there was not a particularly neighborly relationship between *** Patricia *** and Otto Retzer, who owned the [Beshears property] when she purchased the 10 acres in 1958" and (2) there was " 'ample evidence of nonpermissive use' " that overcame any presumption of permissive use based on a neighborly relationship.

¶ 50    The trial court also rejected arguments defendant raised regarding the "extent" of the preliminary injunction. It found plaintiffs had not sought to increase the size of the easement or make any material alterations to the easement. Additionally, it found that plaintiffs had "presented evidence that they intend[ed] to use the property in a way that [was] far less burdensome than many of the prior uses that established the prescriptive right."

¶ 51    This interlocutory appeal followed.

¶ 52                                    II. ANALYSIS

¶ 53                         A. Grant of the Preliminary Injunction

¶ 54    On appeal, defendant first argues the trial court abused its discretion in granting plaintiffs' request for a preliminary injunction. He contends the court erred in finding that plaintiffs raised a fair question that they were likely to succeed on the merits of their claim and show the existence of a prescriptive easement over the private road for the purpose of accessing the Herren property. More specifically, defendant asserts the evidence presented was insufficient to show that plaintiffs' use of the private road was adverse and not permissive.

¶ 55                              1. *Preliminary Injunctions*

¶ 56    "A preliminary injunction preserves the status quo until the merits of the case are decided." *Alms v. Peoria County Election Comm'n*, 2022 IL App (4th) 220976, ¶ 25. "Because a

preliminary injunction is an extraordinary remedy, it should only be granted in situations of extreme emergency or where serious harm would result if the preliminary injunction were not issued." *Id.*

¶ 57 "To obtain a preliminary injunction, the moving party must show (1) a clearly ascertained right in need of protection, (2) irreparable injury in the absence of an injunction, (3) no adequate remedy at law, and (4) a likelihood of success on the merits of the case." *Id.* "The moving party must raise a fair question as to all four elements ***." *Id.*

> "To establish that it has a clearly ascertainable right in need of protection and a likelihood of success on the merits, the plaintiff need only raise a fair question as to the existence of the right and lead the court to believe that it will probably be entitled to the relief requested if the proof sustains its allegations." *Scheffel Financial Services, Inc. v. Heil*, 2014 IL App (5th) 130600, ¶ 10.

If a court finds that all the elements for obtaining a preliminary injunction are met, it must balance the equities associated with the claim, weighing the benefits of granting an injunction against the possible injury to the opposing party. *Alms*, 2022 IL App (4th) 220976, ¶ 26. "Additionally, the court should consider the effect of the injunction on the public." *Id.*

¶ 58 Generally, a trial court's grant or denial of a preliminary injunction is reviewed for an abuse of discretion. *Id.* ¶ 24. "A trial court abuses its discretion only where its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would adopt the court's view." *Id.* Further, we note that when a court rules on a motion for preliminary injunctive relief, "controverted facts on the merits of the case are not decided." *Hartlein v. Illinois Power Co.*, 151 Ill. 2d 142, 156 (1992).

> "When considering the discretion exercised by the trial court in issuing a

preliminary injunction, a reviewing court may decide only whether the petitioner

has demonstrated a *prima facie* case that there is a fair question as to the existence

of the rights claimed; that the circumstances lead to a reasonable belief that they

probably will be entitled to the relief sought, if the evidence sustains the allegations

of the petition; and that matters should be kept in status quo until the case can be

decided on the merits. Thus, the only question before the reviewing court is whether

there is a sufficient showing to sustain the order of the trial court." *Id.* at 157.

¶ 59                                  2. *Prescriptive Easements*

¶ 60          "An easement is a right or privilege in the real estate of another ***." *Nationwide*

*Financial, LP v. Pobuda*, 2014 IL 116717, ¶ 28. "[G]aining an easement by prescription means

merely divesting the true owner of the right to exclude the claimant from using the easement

property for a certain limited purpose." *Brandhorst v. Johnson*, 2014 IL App (4th) 130923, ¶ 76.

"To establish an easement by prescription, the use of the way in question must have been—for a

20-year period—adverse, uninterrupted, exclusive, continuous, and under a claim of right."

*Nationwide Financial*, 2014 IL 116717, ¶ 27.

¶ 61          To satisfy the adversity element, "[t]he use must have been enjoyed under such

circumstances as will indicate that it has been claimed as a right, and has not been regarded by the

parties merely as a privilege or license, revocable at the pleasure of the owners of the soil."

(Internal quotation marks omitted.) *Id.* ¶ 43. "Mere permission to use land cannot ripen into a

prescriptive right, no matter how long the permissive use is enjoyed." *Id.*; see *Weihl v. Wagner*,

210 Ill. App. 3d 894, 895-96 (1991) ("To meet the requirement of adversity, a claimant must show

the use of the property was with the knowledge and acquiescence of the owner but without his

permission."). A rebuttable presumption of adverse use can arise from the "long acquiescence" of

a landowner. *Nationwide Financial*, 2014 IL 116717, ¶ 44.

> " 'Where a way has been used openly, uninterruptedly, continuously and exclusively for more than a period of twenty years, the origin of the way not being shown, there is a presumption of a right or grant from the long acquiescence of the party upon whose land the way is located.' " *Id.* (quoting *Rush v. Collins*, 366 Ill. 307, 315 (1937)).

This presumption of adverse use is based "on the theory that where a right-of-way existed with the knowledge and acquiescence of the owner of the premises for a sufficient period of years, it was presumed that he or his predecessors in title had actually granted an easement and that the easement document had been lost." (Internal quotation marks omitted.) *Id.* ¶ 47.

¶ 62 "The evidence usually resorted to in order to establish the permissive nature of a use is a written or oral license; however, the permission may be inferred from the neighborly relationship of the parties or from other circumstances attending the use." *Roller v. Logan Landfill, Inc.*, 16 Ill. App. 3d 1046, 1052 (1974). Evidence of a neighborly relationship at the inception of a use "may under the appropriate circumstances show the origin of the way." *Nationwide Financial*, 2014 IL 116717, ¶ 53; see *Healy v. Roberts*, 109 Ill. App. 3d 577, 581 (1982) (stating "that evidence of a neighborly relationship may give rise to a rebuttable presumption of permissive use").

¶ 63                                    3. *This Case*

¶ 64 Here, as noted, defendant challenges the trial court's determination based on the adversity element of plaintiffs' prescriptive easement claim. In finding plaintiffs presented a fair question about the existence of a prescriptive easement, the court determined that the evidence supported applying the presumption of adverse use. The court noted that evidence was introduced

that the private road had served as the only access to the land comprising the Herren property since the 1940s and that since 1958, *i.e.*, for more than 60 years, the Herrens and their invitees had used the private road to access the Herren property. It further noted that plaintiffs denied that they ever discussed permission to use the private road with anyone; that there was evidence of exclusivity, in that their claimed right to use the private road did not depend on a like right in others; that their use had been open, with knowledge of the various owners of the Beshears property; and that their use of the private road had been continuous.

¶ 65         Defendant complains the trial court erred in applying the presumption of adverse use. Initially, he contends that the court's analysis of the presumption was incomplete because one consideration for its application is that the origin of the way is unknown and, according to defendant, the court omitted that consideration from its analysis. Defendant also argues that the presumption is inapplicable under the facts of this case because evidence in the record did establish the origin of use of the private road by individuals residing on the Herren property. In particular, defendant notes that Cloninger's family, the Vetters, owned the Herren property before plaintiffs. He also points to evidence of a deed, showing that in 1955, the Vetters transferred "a portion" of what is now the Beshears property to the Retzers. Based on that evidence, defendant concludes that a portion of the private road on the Beshears property was owned by the Vetters while they resided on the Herren property. According to defendant, "[t]he ownership of a portion of the Beshears Property by the Vetters allows this Court to determine the point in time when use of the Private Road on the Beshears Property by individuals who did not own the Beshears property began."

¶ 66         We disagree with defendant's arguments. First, in setting forth its decision, the trial court fully and correctly recited the applicable law, stating as follows:

" 'Where a way has been used openly, uninterruptedly, continuously and exclusively for more than a period of 20 years, *the origin of the way not being shown*, there is a presumption of a right or grant from the long acquiescence of the party upon whose land the way is located. *Rush*, 366 Ill. at 315.' " (Emphasis added.)

The court also specifically addressed "the origin of the way" in a footnote of its decision. In its footnote, the court stated Cloninger's testimony strengthened plaintiffs' showing that their use of the private road was adverse "and that the origin of the way is unknown." Thus, the court was clearly aware of the applicable law and did not omit any necessary considerations for applying the presumption of adverse use.

¶ 67 Second, the record is sufficient to sustain the trial court's finding that the origin of the way, *i.e.*, the use of the private road on the Beshears property by individuals residing on the Herren property, was unknown. Patricia testified that she began using the private road on the Beshears property in 1958, when she first purchased 10 acres of the Herren property. At the time, the Beshears property was owned by the Retzers, and Patricia had no discussions with the Retzers about the private road. Evidence showed Patricia purchased portions of the Herren property from the Vetters, who were also Cloninger's parents. Cloninger testified she was born in 1939 and resided on portions of the Herren property as an infant until she was 18. While she resided there, the Retzers owned the Beshears property. Cloninger further testified that she used the private road to access her residence. She asserted that her family "automatically" used the private road and she did not recall their use of the private road ever being discussed.

¶ 68 As defendant points out on appeal, a deed that was entered into evidence indicates that in March 1955, the Vetters transferred 5 acres of the 70 acres that later became the Beshears

property to the Retzers. However, we fail to see how this evidence establishes the origin of the use of the private road. Notably, defendant's suggestion that the private road was located on the transferred five acres is not supported by the record. In fact, descriptions of the property in the 1955 deed and other deeds submitted by the parties, along with a map of the properties presented by plaintiffs, indicate otherwise. Specifically, a deed transferring the Beshears property from Lorraine to defendant contains the following description of the 70 acres of Beshears property: "The North Half of the South East [*sic*] Quarter of Section 9 Except Ten Acres off of the North Side of the Northeast Quarter of the Southeast Quarter of Said Section 9." The record indicates the 10 acres referenced in the above description is the same 10 acres of the Herren property originally purchased by Patricia in 1958. The map and other evidence in the record further indicate that part of Panther Creek Road ran along the *southeastern* border of the Beshears property. The private road then would have extended in a northerly direction from the southeastern portion of the Beshears property to the 10 acres of the Herren property. The 1955 deed describes the five acres transferred from the Vetters to the Retzers as being "off of the North side of the *Northwest* Quarter *** of the Southeast Quarter *** of Section 9." (Emphasis added.) Thus, the five acres was located on the west side of the Beshears property, while the private road sits on the east side of that property.

¶ 69    Additionally, the mere fact that the Vetters once owned a portion of the Beshears property does not establish the circumstances under which their use of the private road began, particularly when the evidence indicates the private road was located on a different portion of that property. Accordingly, we find no support for defendant's contention that the 1955 transfer required the trial court to find that the "origin of the way" was known in this case.

¶ 70    Defendant next argues that the trial court should have presumed permissive use of

the private road based on the neighborly relationship between the Retzers and the Vetters. In other words, defendant contends that evidence of a neighborly relationship between those families "supports the idea that the origin of the way *** arose from the neighborly relationship." He relies on Cloninger's testimony regarding her family's interactions with the Retzers to support his contentions. Additionally, he contends her testimony shows her family's use of the private road could not have been done under a claim of right because Cloninger assumed her family had been given permission by the Retzers to use the private road.

¶ 71         As set forth above, permissive use "may be inferred from the neighborly relationship of the parties." *Roller*, 16 Ill. App. 3d at 1052. Also, evidence of a neighborly relationship at the inception of a use "may under the appropriate circumstances show the origin of the way." *Nationwide Financial*, 2014 IL 116717, ¶ 53.

¶ 72         In *Nationwide Financial*, 2014 IL 116717, ¶¶ 48-53, the supreme court rejected a similar argument to the one defendant presents here. There, the parties, Nationwide Financial, LP (Nationwide), and the Pobudas, owned adjacent properties, and the Pobudas claimed a prescriptive easement to travel over a strip of Nationwide's land. *Id.* ¶¶ 1-3. In addressing the element of adversity, the court found the presumption of adverse use applied and that the evidence in the case "unequivocally indicate[d] that the origin of the way across [Nationwide's] property ha[d] not been shown and that it [was] unknown." (Emphasis omitted.) *Id.* ¶ 46. In particular, it noted that the Pobudas' predecessor in title had testified that the way across Nationwide's property had already been established when she bought the adjacent property, she traveled over Nationwide's strip of property to access her own property, "she never discussed permission to travel that way with anyone at anytime," and the prior owners never informed her that permission was required to travel across Nationwide's property. *Id.* The court concluded as follows:

"It could be speculated that the origin [of use of the challenged way] was that the original owners of [Nationwide's] property merely granted permission to the original owners of [the Pobudas'] property to travel across the northwest corner strip ***. It is also possible that the original owners of each property had a parol agreement to grant an easement to the owners of [the Pobudas'] property ***. Neither of those scenarios, however, has been shown. Given the absence of evidence that the origin of the way was merely permissive, the presumption is that of a right or grant based on the long acquiescence of the owners on whose land the way is located." *Id.* ¶ 47.

¶ 73    In support of its challenge to the finding of a prescriptive easement, Nationwide argued that the presumption of adversity could not apply "because the evidence show[ed] that 'neighbors simply began using one another's driveways,' and evidence of a neighborly relationship gives rise to a presumption of permissive use." *Id.* ¶ 48. In rejecting that argument, the supreme court distinguished cases that had applied a "presumption of permissive use" (*id.*), noting that in those cases, courts had found the origin of the way based on (1) direct testimony from a landowner's predecessor in title that the use sprang "from a neighborly relationship where the owners simply began using one another's driveways and had no agreement in writing" (*id.* ¶ 50; see *Piper v. Warren*, 61 Ill. App. 2d 460, 463-66 (1965)); (2) direct testimony from a landowner's predecessor in title "testifying that he gave express permission to the plaintiffs to use the driveway" (*Nationwide Financial*, 2014 IL 116717, ¶ 51; see *Deboe v. Flick*, 172 Ill. App. 3d 673, 675-76 (1988)); and (3) testimony from a party defendant that the plaintiff landowner's predecessor in title "did not object to his use of the way because ' "he was just like one of the family," ' " along with evidence that the defendant had requested permission from the plaintiff's predecessor

(*Nationwide Financial*, 2014 IL 116717, ¶ 52 (quoting *Castle v. Yenerich*, 95 Ill. App. 3d 39, 44 (1981))).

¶ 74     We find *Nationwide Financial* is instructive. Here, Cloninger was the earliest eyewitness to the use of the private road on the Beshears property. Significantly, however, she was not a predecessor in title to either plaintiffs or defendant. Rather, Cloninger's parents, the Vetters, were the ones who held title to portions of the Herren property (and at least five acres of the Beshears property). Cloninger was a minor when she resided on the Herren property and used the private road, living there from infancy until the age of 18. Additionally, her testimony showed she had no conversations with the Retzers or anyone regarding the use of the private road, that her family just "automatically" used the road, that her family used the private road to access the Herren property the entire time she resided there, and that, ultimately, she did not know the circumstances under which her family came to use the private road. These facts distinguish the present case from those cases that were identified in *Nationwide Financial* as having applied the presumption of permissive use.

¶ 75     Defendant points out that Cloninger testified to a "friendly" and neighborly relationship between her family and the Retzers. However, while true, nothing in her testimony necessarily reflects which came first, the neighborly relationship or the Vetters' use of the private road. We note that the fact "[t]hat a neighborly relationship later develop[s] is completely consistent with the lost grant theory" upon which the presumption of adverse use is based. See *id.* ¶ 54 ("Although the evidence showed that [the Pobudas' predecessor in title] eventually developed a neighborly relationship with Nationwide's predecessor in title, it is also the case that this was not the origin of the use, but rather that the way had already been established at the time of [the Pobudas' predecessor's] purchase"). As noted, Cloninger's testimony indicates her family used

the private road while residing on the property in the 1940s and 1950s. Nothing in her testimony necessarily establishes when a neighborly relationship developed between her family and the Retzers or that it predated her family's use of the private road.

¶ 76        Finally, defendant also argues that the trial court erred by failing to consider Tarrant's testimony regarding statements allegedly made by Lorraine that she permitted or allowed the Herrens to use the private road. He contends that because plaintiffs did not object to Tarrant's testimony, Lorraine's alleged statements should have been considered.

¶ 77        The record shows that both defendant and Tarrant testified to statements made by Lorraine regarding the Herrens' use of the private road. During defendant's testimony, plaintiffs repeatedly raised hearsay objections, noting that Lorraine had died and could not be called as a witness. The trial court allowed the testimony but ruled that Lorraine's alleged statements could only be used to show their effect on defendant and not to prove the truth of the matter asserted. Later, Tarrant also testified regarding statements allegedly made by Lorraine, and plaintiffs offered no objection to such testimony. In its written decision, the trial court stated it would not consider any statement allegedly made by Lorraine to prove permissive use, stating as follows:

> "To the extent Defendant attempts to rely on any statement attributed to Lorraine McKay, the Court made it abundantly clear that no such statement was allowed for the purpose of proving the truth of the matter asserted, and therefore no alleged statement by Lorraine McKay communicated in any way to Defendant or the realty firm is available to prove permissive use."

¶ 78        As defendant argues, "[h]earsay evidence admitted without objection may be considered by a trial court and is given its natural probative effect." *King v. Ashbrook*, 313 Ill. App. 3d 1040, 1045 (2000). However, "[w]hen unobjected-to hearsay statements are before the

fact finder, it is 'his prerogative to give those statements whatever weight he thought they should be given.' " *S.W. v. Department of Children & Family Services*, 276 Ill. App. 3d 672, 682 (1995) (quoting *Jackson v. Board of Review of the Department of Labor*, 105 Ill. 2d 501, 509 (1985)). Here, although plaintiffs raised no specific contemporaneous objection to Tarrant's testimony regarding Lorraine's statements, the court was not required to give the challenged testimony any weight. Accordingly, we find that the court did not commit reversible error by declining to consider the testimony at issue.

¶ 79        Moreover, even had the trial court considered Tarrant's testimony, such consideration would not have required a finding of permissive use. Tarrant testified that although he did not remember Lorraine's precise statements to him, she conveyed that the Herrens "had permission, authorization, they were allowed to use the road." However, even if we were to assume as defendant suggests that such indefinite testimony showed Lorraine conveyed her permission for use of the private road, the testimony would, at most, be conflicting with other evidence in the record showing no such permission was granted, including testimony from the Herrens that they never had any discussions with Lorraine regarding the use of the private road. As noted, when ruling on a motion for a preliminary injunction, "controverted facts on the merits of the case are not decided." *Hartlein*, 151 Ill. 2d at 156.

¶ 80        Here, the evidence presented was sufficient to sustain the trial court's finding that plaintiffs demonstrated a *prima facie* case that there was a fair question regarding their entitlement to a prescriptive easement over the private road. We find defendant's arguments to the contrary are unpersuasive and that the court committed no abuse of discretion in granting plaintiffs' request for a preliminary injunction.

¶ 81                              B. Extent of the Preliminary Injunction

¶ 82    On appeal, defendant next argues the trial court abused its discretion in refusing to narrow the scope of plaintiffs' preliminary injunction. He contends plaintiffs' current use of the private road impermissibly exceeds the scope of the uses that created the easement and increases the burden to his property. To support his argument, defendant primarily points to the commercial hunting practices of ITB, arguing those practices result in hundreds of trips over the private road each year to reach the Herren property, thereby increasing its use. Additionally, he complains that ITB's use of heavy farm equipment and machinery, which it hauls to the Herren property on trailers on the private road, similarly "exceeds the scope of any prescriptive easement." Defendant further challenges Dennis Herren's bow hunting activities on the Herren property and Norman Becker's maintenance of the CRP ground on that property, suggesting that because such activities were not ongoing for 20 years, they, too, amount to impermissible expansions of the prescriptive easement.

¶ 83    "[T]he extent of the prescriptive easement *** is defined by the prescriptive use that led to the easement's creation." *Limestone Development Corp. v. Village of Lemont*, 284 Ill. App. 3d 848, 855 (1996). "All easements are limited and qualified by the use that established the prescriptive right." *Id.*; see *Klose v. Mende*, 329 Ill. App. 3d 543, 549 (2001) ("The common and ordinary use establishing the right to an easement by prescription limits and qualifies it so that it cannot be given to different uses and purposes."). "Although the owners of an easement are allowed to make repairs so that the easement is reasonably usable, they cannot make material alterations in the easement's character that place a greater burden on the property." *Limestone*, 284 Ill. App. 3d at 857.

¶ 84    Initially, we note that in reaching its decision, the trial court relied on this court's unpublished decision in *H&R Property Service, LLC v. Conine*, 2018 IL App (4th) 170602-U. Neither party has objected to the trial court's reliance on *Conine* and, in fact, both reference *Conine*

on appeal, comparing and contrasting its facts to those of the present case. Nevertheless, we note that Illinois Supreme Court Rule 23(e) (eff. Feb. 1, 2023) provides that unpublished orders are generally nonprecedential and that only nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes. This court has also held that a trial court commits error by relying on an unpublished decision entered before January 1, 2021, although such error may be deemed harmless where the court otherwise reaches the correct conclusion. See *People v. Washington*, 2021 IL App (4th) 200196, ¶ 59 (involving an unpublished order from 2014). But see *Habdab, LLC v. County of Lake*, 2023 IL App (2d) 230006, ¶ 38 n.5 (recognizing the trial court's reliance on an unpublished decision from 2011 and noting that "courts may adopt the reasoning of unpublished orders"). In this instance, we find any error by the court in relying on *Conine* was harmless and that it reached the correct conclusion, *i.e.*, one that was sufficiently supported by the record.

¶ 85          Here, in addressing and rejecting defendant's arguments regarding the extent or scope of the easement and preliminary injunction, the trial court found it significant that plaintiffs had not sought to increase the size or materially alter the easement. It also concluded that "use of the easement over the Private Road was simply for access to the Herren property." The court further stated as follows:

> "Plaintiffs have presented evidence that they intend to use the property in a way that is far less burdensome than many of the prior uses that established the prescriptive right. For years, Plaintiffs, their invitees, and other parties have been using the Private Road for hauling cattle in large trailers for checking on cattle many times per week; for hauling significant farm implements including tractors and combines; for hunting in essentially every season of the year; and for all the

comings and goings of everyday residential life. *** Plaintiffs intend primarily to continue a use—hunting—that has been ongoing for at least 50 years, that would be less burdensome than many of the uses that established the prescriptive right, and that has been ongoing as a commercial enterprise for more than 20 years."

¶ 86 The trial court's findings are supported by the evidence presented. The evidence showed that, for decades, plaintiffs used the private road as their way of accessing the Herren property. They used the Herren property for various purposes, including gardening and growing crops; residential living; family reunions; pasturing cattle; storage; maintaining the CRP and other ground; mushroom hunting; and deer, squirrel, turkey, and coyote hunting. Over the years, various friends and family members were given permission to hunt on the property. Additionally, since 2001, plaintiffs had allowed hunters to lease portions of their property. In connection with maintaining the property and plaintiffs' farming activities, different types of machinery and equipment were transported to the Herren property on the private road. As the trial court noted, evidence indicated that cattle had been pastured on the property from the 1960s until 2010 or 2012. For approximately six months out of each year, individuals visited the Herren property three to four times a week to check on the cattle. Cattle were also transported to and from the Herren property in trailers via the private road. Given the evidence presented, we find defendant's contentions of increased traffic and use of the private road, which allegedly increased the burden to his property, are unpersuasive.

¶ 87 Additionally, the case authority defendant relies upon is distinguishable and does not require reversal of the trial court's decision. Defendant cites two cases—*McCann v. R.W. Dunteman Co.*, 242 Ill. App. 3d 246 (1993), and *Schultz v. Kant*, 148 Ill. App. 3d 565 (1986)—for the proposition that "[a]n increase in the use of a roadway ***, even by the same types of

vehicles the use of which created the prescriptive easement, can result in an impermissible expansion of the easement that increases the burden to the servient estate." First, in *McCann*, 242 Ill. App. 3d at 254-56, the reviewing court essentially found that increased traffic on an easement appurtenant was impermissible because it was for the benefit of two parcels of land that were not part of the dominant estate, *i.e.*, "[t]he tract of land benefitted by the easement." In setting forth its decision, the court stated "[a]n easement appurtenant may not be extended by the dominant estate's owner to accommodate other lands which he may own and for which the easement was not originally intended." *Id.* at 255. Ultimately, *McCann* involved a different type of easement than the one involved in this case and is factually dissimilar.

¶ 88        Second, like this case, *Schultz*, 148 Ill. App. 3d at 573, involved an easement by prescription and a contention by the defendant that the trial court should have placed restrictions on its scope. However, in that case, the reviewing court ultimately rejected the defendant's argument that the trial court erred in failing "to limit the easement to the character, frequency, and purpose made of the easement during the prescriptive period." *Id.* In particular, it found there had been no present increase in the burden of the defendant's property and "no real evidence of any occurring in the future." *Id.* at 575. Further, it held that "[w]hether future uses will go beyond the extent and scope of the easement is a matter for the future determination of the court, if and when the question is presented." *Id.*

¶ 89        In reaching its decision, the *Schultz* court distinguished a California case, wherein the reviewing court affirmed the lower court's decision to limit the frequency of use of an easement based upon a finding that the "contemplated future use" of the easement could have unreasonably increased "the burden to the servient tenement." *Id.* at 574 (citing *Cushman v. Davis*, 145 Cal. Rptr. 791 (Ct. App. 1978)). It noted that evidence in the California case showed the easement at

issue had been used 10 times a year for purposes associated with caring for an apricot orchard but that the owner of the dominant estate planned to subdivide his property and use the easement for residential purposes. *Id.* Ultimately, *Schultz* does not support the argument defendant advances on appeal, and the California case it discusses, *Cushman*, is factually distinguishable.

¶ 90　　　　　Here, the record contains sufficient evidence to sustain the trial court's factual determinations. We find defendant's arguments to the contrary are unpersuasive and that the court did not abuse its discretion with respect to the extent of the preliminary injunction that it granted in plaintiffs' favor.

¶ 91　　　　　　　　　　　　　III. CONCLUSION

¶ 92　　　　　For the reasons stated, we affirm the trial court's judgment.

¶ 93　　　　　Affirmed.

*Herren v. Beshears*, 2025 IL App (4th) 250219

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Calhoun County, No. 23-MR-5; the Hon. Zachary P. Boren, Judge, presiding. |
| **Attorneys for Appellant:** | Brian D. Lee, of Sorling Northrup, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Riley P. Hamilton, of Gates Wise Schlosser & Goebel, of Springfield, for appellees. |